IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MELANIE MASON, DOLORES MASON, | § § § | |
| *Plaintiffs,* | § § | SA-21-CV-00368-ESC |
| vs. | § § | |
| HELPING OUR SENIORS, LLC, | § § § | |
| *Defendant.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is the above-styled cause of action, in which the parties consented to the jurisdiction of a United States Magistrate Judge [#10, #11, #14].  On August 29 and 30, 2022, the parties and their counsel appeared before the Court for a bench trial on all claims at issue in this case.[1]  After considering the evidence presented at trial, the arguments of counsel, and the parties' post-trial briefs [#39, #40], the Court issues the following findings of fact and conclusions of law.

## I. Background

This is a retaliatory discharge case arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).  This Court therefore has subject matter jurisdiction over this action based on federal question jurisdiction.  28 U.S.C. § 1331.  Plaintiffs Melanie Mason and her mother, Dolores Mason, filed this lawsuit seeking damages from their former employer, Defendant Helping Our Seniors, LLC, a company providing in-home, non-medical care and companion services to senior citizens in the San Antonio metropolitan area.  Plaintiffs, who

---

[1] Pursuant to a Joint Advisory filed August 1, 2022 [#34], Plaintiffs waived their right to a jury trial and agreed to proceed with trial to the bench.

worked for Helping Our Seniors as both caregivers and office employees over a period of several years, contend that they were terminated in retaliation for complaints about sexual harassment in the workplace.[2]

In response to these allegations, Helping Our Seniors raises two defenses. Helping Our Seniors first argues that it is not an employer within the meaning of Title VII, as it employed fewer than 15 employees during the relevant time period, and therefore cannot be liable under Title VII. Alternatively, Helping Our Seniors contends it did not engage in retaliation when it terminated Plaintiffs because it had a legitimate, non-retaliatory reason for Plaintiffs' discharge—Plaintiff's unprofessional and disruptive conduct in the office.

## II.  Findings and Conclusions

After considering all of the evidence presented at trial and the parties' post-trial briefing, the Court makes the following findings and conclusions:

**A.     Helping Our Seniors is an employer within the meaning of Title VII.**

Title VII prohibits an employer from discriminating against an employee for opposing any practice made an unlawful employment practice by statute or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statute. 42 U.S.C. § 2000e–3(a). Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." *Id.* at § 2000e(b). Whether Helping Our Seniors employs the "threshold number of

---

[2] Title VII has an administrative exhaustion requirement. 42 U.S.C. § 2000e-5(f)(1); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). Plaintiffs complied with their obligation to exhaust administrative remedies prior to filing this suit, and Plaintiffs' claims in this case are within the scope of their administrative charge of discrimination.

employees for application of Title VII" is an element of Plaintiffs' claim for relief for which they bear the burden of proof.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006).

Plaintiffs were terminated on April 7, 2018, meaning the relevant time period for purposes of evaluating Helping Our Seniors' employer status is 2017 and 2018.  *See* 42 U.S.C. § 2000e(b).  Helping Our Seniors argues that it does not qualify as an employer under Title VII because it did not employ 15 or more employees during the relevant time period.  Rather, Helping Our Seniors contends that its workforce is primarily comprised of approximately 70 caregivers working as independent contractors in the homes of its senior clients.  Plaintiffs respond that Helping Our Seniors misclassified these caregivers as independent contractors, when these workers were in fact employees, and Helping Our Seniors therefore employed 15 or more employees in 20 or more calendar weeks in both 2017 and 2018 so as to qualify as an employer under Title VII.  The parties agree that the classification of Helping Our Seniors' caregivers is dispositive of the question of its employer status under Title VII, as it is undisputed that Helping Our Seniors did not employ 15 or more employees in a capacity other than caregiving at any point during the relevant time period.

In determining whether an individual is an "employee" under Title VII, the Fifth Circuit applies the hybrid "economic realities/common law control test" first recognized in *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C. Cir. 1979).  *See Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 271–72 (5th Cir. 1988) (summarizing the test).  This test considers "the economic realities of the work relationship, and the extent to which the one for whom the work is being done has the right to control the details and means by which the work is to be performed, with emphasis on this latter control factor."  *Id.* at 272; *see also Deal v. State Farm County Mut. Ins.*

*Co. of Tex.*, 5 F.3d 117, 119 (5th Cir. 1993) ("The right to control an employee's conduct is the most important component of the test.").

When examining the control component, the Fifth Circuit has focused on "whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule." *Deal*, 5 F.3d at 119. The economic-realities component of the test focuses on the terms and conditions of employment, considering the following factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir. 1986) (quoting *Spirides*, 613 F.2d at 832).

Applying the governing hybrid economic realities/control test to the evidence adduced at trial, the Court finds that the caregivers working for Helping Our Seniors were employees, not independent contractors. The Court further finds that, taking into consideration these caregivers, Helping Our Seniors had 15 or more employees during 20 or more calendar weeks of 2017 and 2018 so as to qualify as an employer under Title VII.

At trial, Martha Cave, owner and administrator of Helping Our Seniors, and Plaintiffs Dolores and Melanie Cave provided testimony regarding the scope and nature of the work of Helping Our Seniors' caregivers. Regarding the common-law control portion of the test, the

4

evidence establishes that, although Helping Our Seniors did not directly supervise its caregivers while they were providing in-home services during the relevant time period, the company exercised substantial control over the details and means by which the work was performed.  *See Diggs*, 847 F.2d at 272.  Caregivers were not permitted to perform their work in any manner they chose without oversight.

Helping Our Seniors required all new caregivers to undergo an orientation at the time of hiring regarding various company policies, some of which were imposed by the State of Texas on all caregiving entities, and caregivers were required to take quizzes on the content of these policies.  These policies dictated caregiver dress code; imposed rules about hours, scheduling, and pay day; proscribed certain behaviors during caregiver-client interaction; dictated how to treat clients; and covered such topics as chemicals in the workplace, proper body mechanics, protective wear and bloodborne pathogens, and HIPAA regulations.  Additionally, in some circumstances, a particular caregiving assignment required further orientation regarding a client's specific needs.  As part of orientation, Helping Our Seniors also provided its caregivers with an orientation checklist, requiring each caregiver to initial each company policy, indicating assent to the practices governing the employment and caregiver-client relationship.

The Caregiver Coordinator (a role Plaintiff Dolores Mason performed prior to her termination) was responsible for providing caregiver orientation and training, as well as conducting an annual review of all caregivers regarding their work performance.  Caregivers were subject to reprimand or even discharge for failure to adhere to company policy or for performance issues, and Helping Our Seniors had a disciplinary form that it used during the relevant period for reprimanding caregivers.

Regarding the caregiver work schedule, the evidence further establishes that Helping Our Seniors prohibited caregivers from subcontracting or assigning their work to other caregivers without the prior written consent of the company. Although caregivers had discretion to turn down a specific caregiving assignment, if they turned down several assignments, this could result in their services being terminated. As such, Helping Our Seniors retained significant control over setting caregiver work schedules. *See Deal*, 5 F.3d at 119.

The economic-realities portion of the test also dictates a finding that the caregivers were employees, as opposed to independent contractors. The testimony at trial establishes that Helping Our Seniors' caregivers were low-skilled workers who performed household chores, did light cleaning and cooking, assisted with bathing and dressing, ran errands, transported clients to medical appointments, and provided general companionship services. These workers were not required to possess any special skills, have any specialized educational training, or hold a professional license to perform these duties. Additionally, Helping Our Seniors frequently hired new caregivers, such as Plaintiff Melanie Mason, who did not possess any previous caregiving experience. According to Helping Our Seniors' job description for its caregivers used during the relevant period, anyone who was 18 years or older, held a high school diploma or general equivalency degree, could communicate in English, and had a driver's license was eligible for employment as a caregiver. This evidence establishes that the work of Helping Our Seniors' caregivers was not performed by specialists and did not require any special skills typical of those provided by independent contractors. *See Broussard*, 789 F.2d at 1160.

Other factors indicating that caregivers were employees include that caregivers were paid on an hourly basis, and any expenses they incurred in the exercise of their caregiving duties, such as mileage or parking fees, were reimbursed by Helping Our Seniors. Nothing in the record

indicates that caregivers invested in the business or had any opportunity for profit or loss as is typical of an independent-contractor relationship.  Caregivers did not provide any of their own supplies for their work and were not required to maintain liability insurance for the care they provided.  The only insurance they were required to maintain was auto insurance, but this is the same requirement imposed by Texas law on any automobile owner.  Helping Our Seniors itself insured and bonded all its caregivers.  These factors all support the conclusion that the caregivers at issue were employees, not independent contractors.  *See id.*

Furthermore, Ms. Cave testified that Helping Our Seniors favors long-term relationships with its caregivers, and many caregivers did work for Helping Our Seniors for years.  When a client died or moved away from the agency, Helping Our Seniors would find the caregiver a new caregiving assignment.  Helping Our Seniors also retained the right to terminate the employment relationship at any time for failure to perform caregiver obligations or otherwise and to assign its rights and duties with respect to its caregivers at any time without the consent of its caregivers.  These factors also weigh in favor of finding Helping Our Seniors' caregivers to be employees. *See id.*

As for the integral-to-the-business factor, it also favors finding the caregivers were employees. Helping Our Seniors argues that it was merely a matchmaking entity, matching seniors in the community with independent caregivers it neither supervises nor controls.  To the contrary, the evidence establishes that the approximately 70 caregivers who worked for Helping Our Seniors during the relevant period were "integral" to the company's business and performed its primary function of providing in-home care for senior citizens in the San Antonio community. *See id.*

The only economic-realities factors weighing in favor of finding Helping Our Seniors' caregivers to be independent contractors are those pertaining to the payment of taxes and insurance.  Helping Our Seniors did not pay worker's compensation insurance or contribute to Social Security during the relevant period; did not pay employment taxes; and did not offer health insurance to any of its caregivers.  *See id.*  Helping Our Seniors emphasizes these facts and argues that the Court should also heavily weigh the fact that each caregiver signed an independent contractor agreement at the outset of their employment.  Yet, Ms. Cave conceded at trial that this contract is essentially an adhesion contract, i.e., a non-negotiable term of employment.  As such, the Court does not find it to be reflective of the parties' mutual intent as to the structure of the employment relationship, only indicative of Helping Our Seniors' unilateral and self-serving desire to classify its caregivers as contractors.  Labels are "dispositive only to the degree that the label mirrors the economic reality of the relationship."  *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981) (analyzing economic realities of employment relationship in context of Fair Labor Standards Act).

 In summary, applying the governing hybrid control/economic realities test, the Court finds that Plaintiffs have met their burden to establish that Helping Our Seniors' caregivers were employees, not independent contractors, and that Helping Our Seniors therefore employed 15 or more employees during the relevant time period so as to fall within the statutory definition of "employer" under Title VII.

**B.      Melanie Mason engaged in protected conduct under Title VII, and Dolores Mason is an aggrieved person under Title VII.**

Again, Title VII prohibits an employer from discriminating against an employee for opposing any practice made an unlawful employment practice by statute or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation,

8

proceeding, or hearing under the statute.  42 U.S.C. § 2000e–3(a).  It is undisputed that Plaintiffs were both employees within the meaning of Title VII at the time of their termination.  Both were W-2 employees; Plaintiff Melanie Mason worked as an Office Assistant and worked some weeks as a caregiver, and Plaintiff Dolores Mason worked as the Caregiver Coordinator.

To prevail on their claim of unlawful retaliation, Plaintiffs must prove (1) that they engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action. *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).  The parties agree that Helping Our Seniors, acting through Ms. Cave, discharged Plaintiffs on April 7, 2018, and therefore an adverse employment action occurred.  Helping Our Seniors disputes, however, whether Plaintiffs engaged in a protected activity.

An employee has engaged in activity protected by Title VII if she has either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e–3(a).  The opposition clause of § 2000e–3(a) requires the employee to demonstrate that she had at least a "reasonable belief" that the practices she opposed were unlawful.  *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981).  The Court finds that, prior to her termination, Plaintiff Melanie Mason had engaged in activities protected by both the opposition and participation clauses of the anti-retaliation provision of Title VII.

Plaintiff Melanie Mason, a young woman in her 20s, testified that she had repeatedly complained to Ms. Cave that Ms. Cave's husband created a sexually hostile work environment by watching pornography on Sunday mornings during Melanie's office shift.  The evidence at

9

trial established that Helping Our Seniors' office is located in the home of Mr. and Ms. Cave. Melanie further testified that on Sunday mornings, she was the only other person present in the office and hearing Mr. Cave loudly watching pornography made her feel extremely uncomfortable and offended.  According to Melanie, Mr. Cave also made several offensive comments to Melanie over the course of her employment, referencing the watching of pornography and suggesting Melanie used her lunch break to have sex with men at her father's apartment.

Melanie stated in her testimony that she complained to Ms. Cave about Mr. Cave watching pornography in the office for the first time in January 2018, again in March 2018, and a third time on April 7, 2018, the day she was fired.  Melanie also testified that she complained about the conduct to Victor Blalock, Helping Our Seniors' Financial Administrator, in February 2018.  Melanie's testimony was corroborated by Dolores Mason, who testified that she went with her daughter to talk to Ms. Cave about pornography in the workplace in January 2018, and Mr. Blalock, who testified that Melanie had told him that she felt she had been sexually harassed a month or two before her termination.  The Court finds the testimony of these three witnesses credible.

Additionally, both Ms. Cave and Tiffany Rodriguez, Scheduling Coordinator for Helping Our Seniors, testified that they were aware of Mr. Cave's pornography habit.  In light of this consistent testimony and the credible testimony of Melanie regarding her complaints, the Court does not find Ms. Cave's testimony that no employee ever complained about her husband's behavior to be credible.  The Court finds that Melanie complained to her employer regarding conduct that could constitute sexual harassment in the workplace, and these complaints were based on her good-faith, reasonable belief that Mr. Cave's conduct violated federal law.

Additionally, the Court finds that Melanie engaged in protected activity under the participation clause of Title VII, as the evidence establishes that she called the Equal Employment Opportunity Commission ("EEOC") on the afternoon of April 6, 2018, the day before she was terminated, to find out information about filing a charge of sexual harassment against Helping Our Seniors.  Ms. Cave testified that she hung a poster in the Helping Our Seniors office regarding how to contact the EEOC to report discrimination and harassment. Melanie testified that, due to the poster, she knew about her rights under federal law as to reporting unlawful conduct in the workplace and that she called the EEOC from her cell phone the day before she was terminated to inquire about making a complaint.  This testimony was corroborated by Dolores Mason, who testified that Melanie was thinking about making a report to the EEOC on April 6, 2018, then stepped out of the office on her cell phone to make the call. Tiffany Rodriguez and Victor Blalock confirmed that they also witnessed Melanie step outside of the office to place a call after Melanie had indicated she was going to report Ms. Cave and Helping Our Seniors for unlawful conduct.  This testimony is consistent with Ms. Rodriguez's written statement she provided to the Texas Workforce Commission, dated April 19, 2018, in which she states that she overheard Melanie say she was on the phone with the EEOC to report Ms. Cave.  In summary, the Court finds Melanie engaged in protected activity under Title VII prior to her termination.

The Court also finds that Dolores Mason has standing to sue under Title VII because she is an "aggrieved" person under the Act due to her close association with her daughter Melanie. *See* 42 U.S.C. § 2000e-5(f)(1) (conferring the right to file a civil action on persons "aggrieved" under the statute).  An aggrieved person is someone who falls within the zone of interest of a statute, i.e., someone with interests arguably sought to be protected by the statute.  *Thompson v.*

*N. Am. Stainless*, 562 U.S. 170, 177–78 (2011) (holding that Title VII incorporates the Administrative Procedures Act's zone of interest test).   Because Dolores was also employed by Helping Our Seniors, as opposed to a non-employee third party allegedly affected by the termination, she has a strong interest in being protected against unlawful discrimination and retaliation in the Helping Our Seniors workplace.   The fact that she was terminated at the same time as the person engaging in Title VII protected activity further places her directly within the zone of interest of Title VII's anti-retaliation mandate.

**C.     Helping Our Seniors terminated Plaintiffs in retaliation for protected conduct.**

Plaintiffs contend that Helping Our Seniors discharged them from employment in retaliation for the complaints Melanie made to Ms. Cave and to the EEOC regarding sexual harassment in the workplace.  Helping Our Seniors argues that Plaintiffs were terminated for the lawful, non-retaliatory reason that they had a history of unprofessional and disruptive conduct in the office.

In a retaliatory discharge case, the ultimate determination is whether the conduct protected by Title VII was a "but for" cause of the termination.  *Long*, 88 F.3d at 305 n.4.   In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct. *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984).   The evidence at trial establishes that Plaintiffs would not have been terminated but for Melanie's protected conduct.   Helping Our Seniors is therefore liable for retaliatory discharge in violation of Title VII.

First, several witnesses consistently testified that Ms. Cave was aware of Melanie's protected conduct (calling the EEOC) on April 6, 2018, and that she terminated Plaintiffs the

next day.  Ms. Cave herself admitted at trial that, sometime in the afternoon on April 6, Ms. Rodriguez and Mr. Blalock informed her that Melanie contacted the EEOC about filing a complaint against Helping Our Seniors.  Both Ms. Rodriguez and Mr. Blalock confirmed in their trial testimony that they told Ms. Cave what they overheard regarding Melanie making the complaint, and Ms. Rodriguez admitted specifically mentioning the EEOC to Ms. Cave during this conversation.

Additionally, Melanie created a video recording of the actual termination by Ms. Cave on Saturday, April 7, 2018, which was played at trial.  According to Plaintiffs, they arrived at the office that morning for their scheduled shifts and were immediately terminated by Ms. Cave. When they attempted to question Ms. Cave about the reason for the termination, Melanie began recording the conversation with her phone.  In the recording, Ms. Cave directly accuses Melanie of sending a complaint "to the labor board," which the Court interprets as a reference to the EEOC.  In response, Melanie tells Ms. Cave that you cannot fire someone for making a complaint, which is, of course, an accurate statement of the law.  Ms. Cave then states that "[i]n the State of Texas you can fire somebody without any reason," which is as an implicit admission to firing Plaintiffs because of Melanie's complaint to the EEOC.  Although Ms. Cave subsequently states that Plaintiffs had been on the "chopping block" for some time, implying there could be some other reason for Plaintiffs' termination, this statement was not made until after Melanie reminded Ms. Cave that it is illegal to fire someone for making a complaint.

Furthermore, Ms. Cave's stated reason for Plaintiffs' termination is not credible nor supported by the overall testimony presented at trial.  According to Ms. Cave, on April 6, 2018, Plaintiffs were "hollering" and "screaming" at one another, and she was tired of putting up with the "constant chaos" and "noise" in the office due to Plaintiffs' loud and aggressive behavior.

Ms. Rodriguez testified in support of Ms. Cave, stating that Plaintiffs had anger issues and screamed and yelled all the time, and their disagreements could be heard all throughout the Caves' house and the Helping Our Seniors office.  According to Ms. Rodriguez, Plaintiffs argued with one another all day on April 6, 2018, until they left in the afternoon.  Yet, when pressed at trial, Ms. Cave could not provide any details regarding this prolonged screaming and yelling on April 6, such as the basis of Plaintiffs' disagreement, nor explain why she failed to address these purported ongoing behavioral issues with Plaintiffs on April 6 or at any earlier point during Plaintiffs' employment.  Additionally, the evidence established that Plaintiffs were never issued a reprimand or disciplined on any prior occasion by Ms. Cave, had earned promotions and raises over the course of their employment, and had received positive performance reviews.

Given the foregoing, Ms. Cave's testimony about Plaintiffs' alleged behavior on April 6 is not credible.  The credibility of her testimony is further undermined by the inconsistencies between Ms. Cave's trial and deposition testimony and by the fact that her statements regarding the incidents of April 6 shifted over the course of the two-day trial.  Ms. Rodriguez, who is still employed by Helping Our Seniors and has reason to want to remain in Ms. Cave's good graces, also gave testimony that seemed exaggerated and was inconsistent.  Ms. Rodriguez's testimony regarding the alleged angry screaming all day was not credible and is contradicted by other more credible witnesses.

Ms. Cave and Ms. Rodriguez's testimony was further undermined by the testimony of Mr. Blalock, who characterized the incident on April 6, 2018, very differently than Ms. Cave and Ms. Rodriguez.  Mr. Blalock testified that he officed with both Plaintiffs, was present in the office that day, and therefore would have overheard yelling and arguing if it had occurred.  According to Mr. Blalock, Plaintiffs were upset about Ms. Cave's handling of a situation with a

client and were talking with one another in a heated manner about Ms. Cave for approximately five minutes; there was no argument between them during their brief, tense conversation.  Mr. Blalock further testified that, prior to April 6, 2018, he had never heard Plaintiffs arguing with one another or making any disruption in the office whatsoever.  Mr. Blalock's testimony is consistent with the testimony of both Plaintiffs, who testified that they never argued with one another at the office, but that there was tension between Plaintiffs and Ms. Cave on April 6, 2018, regarding a request by Ms. Cave for Dolores to fill in as a caregiver that day.

Finally, Ms. Cave testified at trial that she had no plans to terminate Plaintiffs until April 6, 2018, further undermining her assertion that Plaintiffs had a longstanding pattern of disruptive behavior in the workplace, significant enough to result in their termination.  (This concession is also very strong evidence that it was something that occurred on April 6—contacting the EEOC—that was the but for cause of Plaintiffs' termination.)  Ms. Cave also offered Melanie an unconditional offer of reinstatement several months after her termination, which raises further questions regarding the credibility of Ms. Cave's assertion that Melanie was a problem employee who engaged in continuous unprofessional and disruptive behavior in the workplace.  In summary, viewing the evidence as a whole, the Court finds that Ms. Cave's testimony regarding the reasons for Plaintiffs' termination was not credible and that Plaintiffs would not have been terminated but for Melanie's protected activity.

**D.     Plaintiffs are entitled to an award of damages.**

Title VII provides for the recovery of lost wages as an element of damages.  42 U.S.C. § 2000e-5(g)(1).  The statute provides that back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission.  *Id.*  Interim earnings or

amounts earnable with reasonable diligence by the person discriminated against shall operate to reduce the back pay otherwise allowable. *Id.*

Dolores Mason seeks lost wages for the 73-week period between her separation from employment and September 1, 2019, when she stopped actively looking for work. Melanie Mason seeks lost wages for the nine weeks following her termination from employment on July 7, 2018. Plaintiffs both filed a charge of discrimination with the EEOC on April 9, 2018, just days after their termination. Thus, Plaintiffs are entitled to seek lost wages for the requested time periods under Title VII, and the evidence adduced at trial establishes Plaintiffs' entitlement to lost wages.

Dolores testified at trial that, at the time of her separation, she was working 40 hours per week at the rate of $21.50 per hour. Therefore, her average weekly wages were $860.00, and she would have earned $62,780.00 during the 73 weeks between April 7, 2018, and September 1, 2019. After deducting her unemployment compensation benefits of $10,400.00 as well as interim earnings of $578.00, Dolores's total lost wages amount to $51,802.00. The Court awards Plaintiff Dolores Mason this amount.

Melanie testified that, while employed by Helping Our Seniors, she was earning $21.00 per hour and normally worked 20 hours per week. Thus, her average weekly earnings were $420.00. After her termination, Melanie was unemployed for approximately nine weeks, during which time she received $1,700.00 in unemployment benefits. After the deduction of unemployment benefits, Melanie suffered lost wages in the amount of $2,080.00. The Court awards Plaintiff Melanie Mason this amount.

Plaintiffs also seek emotional distress damages. A prevailing Title VII plaintiff may recover damages for emotional distress, mental anguish, and loss of enjoyment of life as

compensatory damages.   42 U.S.C. § 1981a(b)(3).   Compensatory damages do not include backpay and are limited to $50,000 in the case of an employer with more than 14 and fewer than 101 employees, as here.  *Id.* at §§ 1981a(b)(2), (3).

Dolores Mason testified at trial that she suffered depression as a result of her termination from employment and had to seek medical treatment and take prescribed medications.  She described symptoms of loss of appetite, weight loss, and sleeplessness due to her loss of employment.  Additionally, due to her financial difficulties, Dolores could no longer afford her rent and was forced to move to Wichita Falls, Texas, to live with her middle daughter, causing further emotional distress.  The Court will award Dolores Mason emotional distress damages in the amount of $10,000.

Melanie similarly testified that she suffered from depression, anxiety, and lack of motivation, resulting in treatment from a psychiatrist and therapist and prescription anxiety medication, although she is not seeking medical damages.  Melanie also described the guilt she feels over causing her mother's termination and the humiliation she experienced when she was asked as part of a background check regarding this lawsuit against her former employer.  She also testified that she discovered during the process of applying for subsequent employment that Ms. Cave had reported to prospective employers that Melanie had engaged in financial improprieties while working for Helping Our Seniors.  The Court will award Melanie Mason emotional distress damages in the amount of $10,000.

Finally, Plaintiffs seek punitive damages.  A prevailing Title VII plaintiff may recover punitive damages when the defendant engaged in a discriminatory practice with malice or reckless disregard for the plaintiff's federally protected rights.  *Id.* at § 1981a(b)(1).  Plaintiffs contend that Helping Our Seniors, acting through Ms. Cave, showed reckless indifference when

it discharged Plaintiffs in retaliation for the exercise of their rights under Title VII.  The Court agrees.  Ms. Cave testified at trial that she was aware at the time of Plaintiffs' termination that it is illegal to discharge an employee for contacting the EEOC or because the employee made a good-faith complaint of a sexually hostile work environment.  The video recording of Plaintiffs' termination depicts Melanie informing Ms. Cave repeatedly that it is illegal to terminate someone for making a complaint to the EEOC.  Yet Ms. Cave went forward with the termination anyway.

The Court also heard testimony regarding Ms. Cave informing the Department of Defense that Melanie had engaged in financial improprieties in her work for Helping Our Seniors when asked to provide Melanie a reference for prospective employment.  When questioned about these allegations, Ms. Cave could not recall what she had said about Melanie and did not have any evidence to substantiate her accusations.  These allegations of financial misconduct cannot be reconciled with Ms. Cave's offer of reinstatement to Melanie after her termination and are therefore evidence of an intent to injure Melanie and prevent her from obtaining future employment.  The Court finds that an award of punitive damages will punish Helping Our Seniors for its actions and deter similar conduct in the future.  The Court awards Melanie Mason punitive damages in the amount of $5,000 and Dolores Mason punitive damages in the amount of $5,000.

**E.      This Court will exercise its discretion and award Plaintiffs attorney's fees.**

Plaintiffs pleaded the recovery of attorney's fees in their Complaint.  (Am. Compl. [#7] at ¶ 11.)  Title VII authorizes the award of reasonable attorney's fees to a prevailing party as part of the costs of litigation.  42 U.S.C. § 2000e-5(k).  Although such an award is discretionary, the Supreme Court has held that a prevailing plaintiff under VII should ordinarily be awarded

attorney's fees unless special circumstances would render such an award unjust.  *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 412 (1975).  This standard favoring the award of fees to prevailing plaintiffs recognizes the strong public interest in having individual Title VII plaintiffs act as private attorneys general.  *Id.* at 415.

This Court has discretion to determine the reasonableness of the fees.  *Tyler v. Union Oil Co. of Calif.*, 304 F.3d 379, 404 (5th Cir. 2002).  Plaintiffs may file a separate motion to recover attorney's fees and a bill of costs as dictated by this Court's Local Rules.  *See* W.D. Tex. Loc. R. CV-54.  The parties are instructed to confer on Plaintiffs' attorney's fees demand and attempt to reach agreement on what constitutes a reasonable fee award.  The parties are also instructed to confer on costs prior to Plaintiffs submitting a Bill of Costs (using the form available on the Court's website).  Plaintiffs should include a certificate of conference with their Bill of Costs and notify the Court if any costs remain in dispute.  If an agreement cannot be reached as to costs, Helping Our Seniors may file any objection in accordance with the provisions of Rule CV-7.

**IT IS SO ORDERED.**

SIGNED this 13th day of October, 2022.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE